## AMANDA RHODES *v.* THE STATE.

1. CONFESSIONS MADE IN ARREST.— There is an established distinction between the competency as evidence of acts done and confessions made by a defendant in arrest. The former are admissible, but the latter, unless clearly within the provisions of the statute, are not admissible.

2. SAME — CASE STATED.— It being already in proof in a trial for theft of money that the defendant and her little daughter were arrested for the offense, and that disclosures made by the latter induced the officer to take the defendant to her house, with expectation of recovering the money there, the State was further allowed, over objection by the defense, to prove that the defendant, after reaching her home, and while still in arrest and uncautioned, voluntarily raised a plank and seemed to be searching under it for the money. *Held*, that there was no error in allowing this act of the defendant to be put in evidence. It was not a confession.

3. ACCOMPLICE TESTIMONY.— In a trial for theft the daughter of the accused was a witness for the State, and it was in proof that she had falsely denied any knowledge of the stolen money. *Held*, that this fact alone did not suffice to render her an accomplice witness.

4. PRACTICE IN THIS COURT.— Though in a felony case it is the duty of the trial court to charge the law applicable to every legitimate

phase of the case, yet the omission to do so is not necessarily erroneous when it is not palpable and radical, and was not called to the attention of the trial court.

5. THEFT OF LOST PROPERTY.— The case of *Robinson* v. *State, ante,* p. 403, cited with approval on the subject of the theft of lost property.

6. SAME — FACT CASE.— See evidence *held* sufficient to sustain a conviction for the theft of lost money.

APPEAL from the District Court of Limestone.  Tried below before the Hon. L. D. BRADLEY.

The indictment charged that on June 7, 1881, the appellant fraudulently took, stole and carried away four hundred and forty-four dollars, the property of Mrs. R. E. Stephens.  A description of the money was set forth in the indictment, showing all of it to have consisted of United States Treasury and national bank notes, except seventy dollars in United States gold coin, and nine dollars in silver.  The trial resulted in a verdict of conviction, and the assessment of the appellant's punishment at a term of two years in the penitentiary.

Mrs. R. E. Stephens, for the State, testified that on June 7, 1881, about an hour before sunset, she started home from the house of Mr. Strain, her son-in-law, having with her a small red leather "lady's companion," and in it $444 in money of the description set out in the indictment.  When witness started home she put the companion with its contents on the seat of her buggy, but her little niece, who was with her, moved it from the middle to the end of the seat, and occupied the space between the witness and the small satchel or "companion."  After driving a half or three-quarters of a mile on her road towards home, witness missed the satchel and drove rapidly back in search of it.  She did not know where it had dropped out of the buggy, but knew it was lost between Mr. Strain's and the point at which she missed it.  Just before she got back to Mr. Strain's gate she met the

.defendant and her little daughter, and spoke to them, but it did not occur to witness that either of them had the satchel and money.  Witness had known the defendant for years, and before emancipation, and had never heard that the defendant could read.  In witness's little satchel there were other articles besides her money; there was a small pocket-knife, an ivory memorandum, and a large piece of pasteboard with her name on one side and a verse on the other.  The money was restored to witness the next day by Mr. McLendon, a deputy sheriff.  Some of the other articles in the satchel, but not the satchel itself nor the pasteboard, had also been returned to witness.  The girl who was with the defendant had a bag or sack in her hand.  The defendant knew witness well, and knew that Mr. Strain was the son-in-law of witness.  Until recently the defendant had often been on the farm where witness had lived for many years.

Mary Rhodes, for the State, testified that she was twelve years of age, and a daughter of the defendant.  On June 7, 1881, about an hour by sun, while witness and the defendant were on their way home, they found a lady's companion in the road near Mr. Strain's gate.  It was in a wagon-track about seventy yards from the gate.  Witness picked it up and put it in a sack in which they had some squashes.  She put it in the sack because her mother told her to do so.  They met Mrs. Stephens just after they passed Mr. Strain's gate.  They did not examine the companion until they got home, nor did the defendant have it before they reached home.  Witness, in the presence of the defendant, took it out of the sack and saw the money, and laid the satchel and money on a table, and then went out of the house.  She had never seen the money since, and did not know what became of it or the companion since she laid them on the table.  She did not see Mrs. Stephens until after she put the money in the sack.  Her mother told her to open the satchel, after they got home.

J. W. Stephens, for the State, testified that he was a son of Mrs. R. E. Stephens, and, hearing in the night of June 7, 1881, that his mother had lost her money, he went to the house of the defendant and told her of the loss and where Mrs. Stephens thought she dropped the satchel. Witness described to her the satchel and its contents, and, in reply to his question if she had found it, she denied that she had seen it, and said she had seen no such satchel. This was early in the night of June 7, 1881, and the defendant's husband, Allen Rhodes, came home about nine o'clock. Cynthia Stroud, another negro, was there. Deputy Sheriff McLendon soon came, and he and the witness arrested the defendant and her daughter Mary. Before they were arrested they denied any knowledge of the satchel and money. McLendon and the witness took the defendant and her daughter about half a mile from their home, and kept them in arrest all night. The next morning, in consequence of a statement made by Mary Rhodes, the witness and McLendon took her and the defendant back to their house, expecting to get the money. When they got there the defendant took up a plank and looked under the floor, like she was looking for the money; but she produced nothing. (The defense objected to this evidence, on the ground that the act of the defendant was in the nature of a confession, and she was in arrest and uncautioned when it was done. The court overruled the objection, and the defense reserved exceptions.) The witness further testified that he went out of the defendant's house to look after another negro, and when he came back McLendon had the money and was counting it.

Thomas McLendon, the deputy sheriff, for the State, testified that in the night of June 7, 1881, he arrested the defendant and her daughter Mary on a charge of theft of Mrs. Stephens's money. The next morning he took them back to the defendant's house. While there the witness saw Cynthia Rhodes (meaning the woman called Cynthia

Stroud by the preceding witness) go into another cabin. Witness followed her and told her she had the money and must give it up. At first she denied having it, but afterwards she got $365 of it, which was in United States currency, and gave that to witness. She got it from about her bed. Witness then went back to the house of the defendant, and she gave him the gold and silver, which amounted to about $79. Witness restored the money to Mrs. Stephens.

The defense proved that the defendant could not read nor write.

*M. D. Herring* and *B. M. Burrow,* for the appellant. Where two parties are arrested charged with the same offense, theft of money, and one of the parties while so under arrest makes statements to the officer, which induces him the next morning to take both parties back to their residence, and after so being under arrest all night, and taken back home, the other party takes up a plank and looks under the floor, like she was looking for the money, but produced nothing, it is a verbal act in the nature of a confession, and is not admissible, unless the party was cautioned.

When the confession of the main fact in issue would not be admissible, evidence of a collateral fact tending to establish the main fact is also inadmissible. *Haynie* v. *State,* 2 Texas Ct. App. 168; *Davis* v. *State,* 2 Texas Ct. App. 588; *Taylor* v. *State,* 3 Texas Ct. App. 387; *Marshall* v. *State,* 5 Texas Ct. App. 293; *O'Connell* v. *State,* 10 Texas Ct. App. 567.

Defendant charged with stealing bacon proved that "when defendant was arrested and carried to the house at which he lived, he placed a certain saddle on the horse ridden by him to the justice's office, and that upon the saddle were found marks of a rope and grease, which to witnesses looked like bacon grease." Objected to, but

grounds of objection not stated. No exception reserved. Held, Hurt, Justice: "This is too vague; the ground or reason for the objection should have been stated, and if defendant had objected because defèndant was under arrest and the proper predicate had not been shown, a very serious question would have been presented." *Cohea* v. *State*, *ante*, p. 153.

If defendant is guilty of theft, then her daughter Mary *may* have been an *accomplice* to the said crime, and the charge of the court should have instructed the jury in relation thereto. All the law applicable to every phase of the case should be charged, whether asked or not, in felonies. *Kelly* v. *State*, 1 Texas Ct. App. 637; *Johnson* v. *State*, 27 Texas, 758; *O'Nealy* v. *State*, 1 Texas Ct. App. 180; *Bishop* v. *State*, 43 Texas, 390; *Riojas* v. *State*, 8 Texas Ct. App. 49; *Talbot* v. *State*, 8 Texas Ct. App. 412; *Lindley* v. *State*, id. 445; *Scott* v. *State*, 10 Texas Ct. App. 112.

Where a material witness for the State *may* have been an *accomplice* in the offense on trial, the court should charge the law as to the evidence of accomplices. *Kelly* v. *State*, 1 Texas Ct. App. 637, in which the charge was not requested. *Hoyle* v. *State*, 4 Texas Ct. App. 239. *Wright* v. *State*, 7 Texas Ct. App. 574, in which case it is said "that the question as to whether the witness was or was not a guilty confederate was properly submitted to the jury, with appropriate instructions upon the law controlling accomplice testimony, and its effect upon the case if they found witness to be such confederate."

There can be no theft in this State without the defendant, *at the time he obtained possession* of the *property,* intended to deprive the *owner* of the value thereof, except in two cases:

1st. Where the taking, originally lawful, was obtained by some false pretext, and the same is appropriated to the use and benefit of the taker.

2d. Any other unlawful acquisition of personal property, punishable by the Penal Code.

The statute in terms says, "the taking must be wrongful, so that if the property came into possession of the accused by lawful means, the *subsequent appropriation* of it is not theft; but if the taking, though originally lawful, was obtained by any false pretext, or with intent to deprive the owner of the value thereof, and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is complete." Penal Code, art. 727. Under this provision, the intent must exist to deprive the owner of the property when the possession is obtained, in every case *but one*, and that is when a false pretext is used in obtaining possession. The general definition is, that theft is the fraudulently *taking* . . .. with intent to deprive the owner of the value of the same. Penal Code, art. 724.

The case does not come within the definition of any other unlawful acquisition of personal property punishable by the Penal Code. Code Crim. Proc. art. 714. If it did, the instructions of the court are not applicable to such case. *Vincent* v. *State*, 10 Texas Ct. App. 331.

That the finder of lost goods is in the lawful possession of them is elementary, and needs no citation of authorities.

Mr. Bishop says: " . . Lost goods, which a person takes into his possession lawfully, not knowing the owner, and afterwards ascertains who the owner is, yet with felonious intent converts it to his own use, he commits no larceny." 2 Bish. Crim. Law, sec. 841. Again he says: "The finder has the right to appropriate lost goods to himself, subject to the claim of the owner. He therefore gains, immediately upon finding, a special kind of property in the goods, of such nature that where there is no larceny in the original taking, there can be none in any subsequent misappropriation . . with a full knowledge of the true ownership." 2 Bish. Crim. Law, sec. 859.

" The law gives the finder a title in lost goods, but it is not full and unconditional; so if he takes them with intent to steal them, he commits a larceny.   The doctrine therefore is that if, when one takes lost goods into his possession, he sees about them marks, or otherwise learns any facts, by which he knew who the owner is, yet with felonious intent appropriates them to his own use, he is guilty of larceny; otherwise not. . . .   The guilt of the defendant must attach at the moment, if ever, without depending on an if." 2 Bish. Crim. Law, sec. 860.

Justice Winkler, in *Reed* v. *State*, recognizes and applies these principles to a case of lost goods.   He says, " In all cases the taking must be wrongful.   If the' property came into the possession of the accused by lawful means, the subsequent appropriation is not theft; but if the taking, though originally lawful, was obtained by any false pretext, or with intent to deprive the owner of the value thereof, . .   and the same is so appropriated, it is theft."   Citing Penal Code, art. 727, he proceeds, after reviewing the evidence: " Under these circumstances the jury were warranted in coming to the conclusion that the defendant *when he obtained possession* of the pocket book, whether he found it himself, or obtained it from another, intended to deprive the owner of it and assume dominion over it." *Reed* v. *State*, 8 Texas Ct. App. 41.   He deduces these general rules for lost goods, but applies them in connection with the above citation from the Penal Code.

Again, Justice Hurt says in a case of lost goods: " Suppose that at the time of the taking defendant knew, or had reasonable grounds for *believing*, that there was an owner to whom he could have delivered them, and if so knowing he intended to deprive the owner of their value, and appropriate them to his own use, he would be guilty; citing *Statum* v. *State*, 9 Texas Ct. App. 273.   This was a cause where the accused saw the owner drop money in the presence of accused, and he put his foot on it until

the owner turned away, and then picked it up. The intent to appropriate was properly referred to the *time of the taking.*

In an English case, Bovell, C. J. (12 Cox's Crim. Cases, 489), says: "The prisoner found two heifers strayed, and put them on his own marshes to graze. Soon after, he was informed by S. that they had been put on his, S.'s, marshes, and had strayed, and that they belonged to H. Defendant left them on his marshes a day or so, and then sent them a long distance away, as *his own property.* He then told S. he had lost them and denied all knowledge of them. The jury found, 1st, that at the time defendant found the heifers he had reasonable expectation that the owner could be found, and that he did not believe that they had been abandoned by the owner; 2d, that *at the time* of finding them he *did not* intend to *steal them,* but that the intention to steal came on him subsequently; 3d, that the prisoner, when he sent them away, did so for the purpose of and with the intent of depriving the owner of them and appropriating them to his own use. Held, "not having any intention to steal when he *first found* them, . . unless there was something equivalent to a bailment afterwards, he could not be convicted of larceny. On the whole we think there was not sufficient proof to make this out to be a case of larceny by a bailee." *Regina* v. *Matthews,* 1 Green's Criminal Reports, 32.

Another case: "Prisoner received from his wife a £10 Bank of England note, which *she had found,* and passed it away. The note was indorsed E. May only, and the prisoner, when asked to put his name on it by the person to whom he passed it, wrote on it a false name and address. When charged at the police station, he said he knew nothing about the note. Held, the jury ought to have been asked whether the prisoner, at the time he *received the note,* believed the *owner could be found,* and

the conviction was wrong." *Rex* v. *Knight*, 12 Cox's Crim. Cases; 2 Green's Criminal Reports, 35.

Riddle, Justice, in *Bailey* v. *State*, 52 Ind. 462, says: "If Maffett lost his shoes — a supposition not at all unlikely, considering his condition at the time, — and the appellant merely found them and took them, not knowing, and not having the means to find out, who owned them, he cannot be guilty of larceny, however reprehensible his conduct be afterwards, in attempting to appropriate the shoes; and his conduct may be interpreted as nothing more than an attempt to fortify his claim to the shoes he had found, instead of stolen. We are of the opinion the conviction is not a safe one under the law." American Reports, 182.

The finders of a pocket book in the highway, containing bank bills and having the name of the owner legibly written on it, were convicted of larceny *upon proof that they could read*, and had converted the property to their own use. *State* v. *Weston et al.* 9 Conn. 527, cited in note to *Baley* v. *State*, 21 American Reports, 187.

From these authorities we deduce the following principles:

1st. The intent to steal must exist at the time of obtaining possession of lost goods.

2d. The third rule laid down in *Reed* v. *State*, 8 Texas Ct. App. 42, to wit: "Where a man finds goods that have actually been lost, or are reasonably supposed by him to be lost, and appropriates them with intent to take entire dominion over them, *he at the same time* (the time of the finding) knowing, or really believing the owner can be found, this is larceny, whether the finder *afterwards* converts them to his own use or not," means simply that there must be marks, and circumstances, connected with the lost goods and the manner of their being found (intelligible to the finder) which reasonably indicate to the finder, at the time, who the owner is.

In the very language of the statute: "If the possession of the person accused of theft came by lawful means, the subsequent appropriation of it is not theft, . . . unless a false pretext is used, or [as we claim] the intent to deprive the owner of the value thereof," exists at the time of obtaining possession by lawful means.

Hence as there was no evidence tending to show that defendant obtained the companion and money by any false pretext, the charge should have limited the fraudulent intent to the time of obtaining the possession of the property. *Hudson* v. *State,* 10 Texas Ct. App. 216; *Hornback* v. *State,* 10 Texas Ct. App. 408.

*H. Chilton,* Assistant Attorney General, for the State.

WHITE, P. J. The rules with regard to confessions of a party when under arrest are not applicable to *the acts* of appellant Amanda Rhodes, which were by the court admitted in evidence over objection of defendant. She made no confession. After her daughter Mary had made disclosures concerning the money, the accused voluntarily raised a plank and appeared to be searching for the money. She subsequently produced and handed the officer the gold and silver ($79), part of the stolen money. Evidence of this latter act or fact was not objected to, and is not now complained of. It was a much more conclusive and damaging confession of guilt than the raising of the plank; and yet we scarcely imagine that it will be contended that such evidence would have been illegal and inadmissible if it had been objected to. A distinction has always been made between acts performed and confessions made by a defendant whilst under arrest. The former are admitted, whilst the latter are not unless coming strictly within the letter of the statute. This distinction was clearly drawn in the case of *Elizabeth* v. *State,* 27 Texas, 329, wherein it was held that, independent of the confession, the acts of the accused in going to

the pool of water and bringing from it the dead body of the murdered child were admissible in evidence against her. See also *Walker* v. *State*, 7 Texas Ct. App. 245; *Preston* v. *State*, 8 Texas Ct. App. 55.

Nor did the court err in declining to charge the law governing accomplice testimony with reference to the evidence of the witness Mary Rhodes. There is in the record no fact tending to connect this witness as an accomplice with her mother in the theft of the money, save the fact that before her arrest she denied any knowledge of the money and the lady's companion containing it. "Such statements are not evidence of crime where the testimony clearly indicates others as the offenders and furnishes another motive for such statements than concealment of the guilt of the party making them." *Porter* v. *State*, 43 Texas, 367.

Besides this, no charge was requested on the subject of accomplices; no exception was reserved to the charge for omission in that respect, and no objection to that effect was urged against the charge in the motion for a new trial. And while it is the duty of the court in felony cases to charge the law applicable to every legitimate phase of the case, yet a reversal will not necessarily ensue where the error has not been pointed out in the trial court, unless so fundamental and manifest as to be palpable and radical. But, as was said before, this was not a legitimate phase of the case, there being no evidence going to show that the witness Mary was an accomplice with defendant in the theft of the money. She picked up the companion containing the money, and, at the instance of her mother, put it in the sack she was carrying,— carried it home, neither she or her mother knowing that it contained the money. She carried the sack and contents home, and after reaching there took out the lady's companion, opened it, and for the first time the parties discovered the money. Further than that she had nothing to do with the theft. At that time necessarily the fraud-

ulent intent to steal and appropriate the money must for the first time have been entertained by the mother. Up to that time she was not aware that the companion contained it; it, the money, was to all intents and purposes still lost up to that time. And whilst her possession of the companion was lawful at the time she found it, the taking and asportation of the money within it was an involuntary act, because she did not know of its existence, and she could not then have entertained any intent, felonious or otherwise, with regard to it, so long as she was ignorant that it was in her possession. When she discovered the money upon her arrival at home, that was the first moment at which she could possibly have formed and entertained a purpose and intent with regard to it. Up to that time the money was lost. *Robinson* v. *State, ante,* p. 403.

Taking that as the initial point, and we are of opinion that her guilt is clearly established by the evidence. At that very time she had the means of ascertaining who the owner was. For Mrs. Stephens, the owner, swears that the companion also contained a large piece of pasteboard with her· (Mrs. S.'s) name on it. This certainly was all defendant needed to ascertain the owner. It was sufficient to put her upon inquiry. And though she might not have been able to read herself, and in that way find the owner, she might still, as soon as possible, with little trouble have sought some one who could and would have given her the information. If she did not intend to steal the money at that time, how is her conduct to be reconciled with the hypothesis of her innocence. See *Robinson* v. *State, supra.*

The charge of the court presented fully the law of the case, and no error is made apparent, sufficient to require a reversal of the judgment. The verdict and judgment are amply sustained by the evidence.

The judgment is affirmed.

*Affirmed.*